FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 15 2021

TAMMY H. DOWNS, CLERK
By: [signature] DEP CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | |
|---|---|
| STANLEY JONES, BLACK SPICE FARMS, INC., BRITT JONES, INC., HOGBACK FARM, INC., J-CO FARMS, NORTH 40 FARMS, INC., S&W FARMS, SIB FARMS, T&W FARMS, and SLOUGH FARMS, INC., individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORTEVA, INC. and CORTEVA AGRISCIENCE LLC,<br><br>Defendants. | Case No.: 3:21-cv-237-BSM<br><br>COMPLAINT – CLASS ACTION<br><br>DEMAND FOR JURY TRIAL<br><br>This case assigned to District Judge Miller<br>and to Magistrate Judge Harris |

Plaintiffs Stanley Jones, Black Spice Farms, Inc., Britt Jones, Inc., HogBack Farm, Inc., J-Co Farms, North 40 Farms, Inc., S&W Farms, SIB Farms, T&W Farms, and Slough Farms, Inc. bring this Complaint on behalf of themselves and all others similarly situated for damages, declaratory relief, and punitive damages against Defendants Corteva, Inc. and Corteva Agriscience LLC, and allege as follows:

## I. INTRODUCTION

1. Loyant is a "rice herbicide" manufactured and marketed by Defendants. As a "rice herbicide," Loyant is intended to control certain grass and weeds that interfere with the growth of rice crops. The most common of these problematic plants is barnyardgrass. Others include rice flatsedge, yellow nutsedge, broadleaf signalgrass, junglerice purple nutsedge, and smallflower umbrellasedge.

2. Plaintiff Stanley Jones is a rice farmer in Hoxie, Arkansas. In early 2018—on his behalf and on behalf of various rice-farming entities he owns and operates—he purchased 100

gallons of Loyant to control the grass and weeds in his rice fields for the 2018 growing year. He made this purchase based on Defendants' representations that Loyant would be nearly 100% effective at controlling barnyardgrass.

3. Loyant was far from 100% effective at controlling barnyardgrass. Instead, after applying Loyant, the barnyardgrass and other weeds did not die as Defendants represented they would. After Jones complained to Defendants, their employees encouraged Jones to flood his rice fields, apply fertilizer, and wait for the Loyant to work. This step did not solve Jones's barnyardgrass problem. In fact, following Defendants' advice only served to make the barnyard grass and weeds worse in Jones's fields and ultimately resulted in some fields being so overgrown with barnyard grass that that fields were a total loss.

4. Jones is not alone. Thousands of farmers in Arkansas—the heart of the American rice industry—bought and applied Loyant for its supposed barnyardgrass control, only to see their 2018 rice yield suffer when the herbicide did not work. Each of these growers suffered financial injury ranging from the amount they paid for Loyant to the amount of rice they were unable to grow—and, thus, sell—in 2018.

5. On behalf of themselves and all other Arkansas rice growers, Plaintiffs seek damages for Defendants' breach of their warranty obligations to provide a product that could control barnyardgrass in rice fields.

## II. PARTIES

### A. Plaintiffs

6. Plaintiff Stanley Jones ("Stan Jones" or "Jones") is a citizen and resident of Lawrence County, Arkansas. Jones is the owner and operator of various entities, including Plaintiffs Black Spice Farms, Inc., Britt Jones, Inc., HogBack Farm, Inc., J-Co Farms, North 40 Farms, Inc., S&W Farms, SIB Farms, T&W Farms, and Slough Farms, Inc. All of these entity

Plaintiffs are Arkansas corporations with their principal place of business in Lawrence County, Arkansas. This Complaint refers to Jones and these entities collectively as the "Jones Operation."

**B. Defendants**

7. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Corteva, Inc. was created on June 1, 2019 through a previously announced separation of the agriculture business of DuPont de Nemours, Inc. (formerly known as DowDuPont Inc.). Upon its formation, Corteva, Inc. inherited all the assets and liabilities of the agriculture business of DuPont de Nemours, Inc.

8. Defendant Corteva Agriscience LLC ("Corteva Agriscience") is a Delaware corporation with its principal place of business at 9330 Zionsville Road, Indianapolis, Indiana 46268. Corteva Agriscience is a wholly owned subsidiary of Corteva, Inc. Corteva Agriscience is the successor company to Dow AgroSciences LLC, which manufactured and sold Loyant until company's assets were transferred to Corteva Agriscience. Upon its formation, Corteva Agriscience inherited all the assets and liabilities of Dow AgroSciences LLC.

9. This Complaint uses "Defendants" to refer to all entities that have at any time manufactured, marketed, and sold Loyant. These entities include named Defendants Corteva, Inc. and Corteva Agriscience LLC, as well as predecessor companies DuPont de Nemours, Inc., DowDuPont Inc., Dow AgroSciences LLC, and E. I. du Pont de Nemours and Company. Corteva, Inc. and Corteva Agriscience inherited all of the relevant assets and liabilities of these predecessor companies.

10. This Complaint uses "Dow" to refer to the entities that manufactured, marketed, and sold Loyant prior to the formation of Corteva, Inc. in 2019.

## III. JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class consists of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

12. This Court has personal jurisdiction over Corteva, Inc. and Corteva Agriscience LLC who are registered to do business in Arkansas, have sufficient minimum contacts in Arkansas, committed acts in furtherance of the allegations in this Complaint in Arkansas, and/or otherwise intentionally avail themselves of the markets within Arkansas through their business activities, such that the exercise of jurisdiction by this Court is proper. The registered agent for Corteva, Inc. and Corteva Agriscience LLC is C T Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, and sold Loyant, and otherwise conducted extensive business, within this District.

## IV. FACTUAL ALLEGATIONS

### A. Rice production is a large part of the Arkansas economy.

14. Every year, farmers in the United States plant and harvest over 2.5 million acres of rice.

15. Approximately half of all American-produced rice—over 1.2 million acres in 2021—is grown in Arkansas. The other major rice-producing states are California, Louisiana, Mississippi, Missouri, and Texas.

16. Rice comes in three main lengths: long, medium, and short. Almost all of the rice grown in Arkansas—1.1 million acres—is long grain. The rest is medium grain (0.1 million acres), with a negligible amount of short grain (1,000 acres total in 2021).[1]

17. The American rice industry is crucial to the domestic—and Arkansas—economy. In 2020, the Arkansas rice crop generated nearly $1.3 billion in sales. Beyond the value of the crop production, rice farming generates over $4 billion for the Arkansas economy annually.

18. There are over 2,500 rice farms in Arkansas, 96% of which are family owned.

**B. Barnyardgrass and other weeds inhibit rice growth and cultivation.**

19. A rice farmer's profitability depends, in part, on the volume of rice produced from each acre of his or her operation. The more rice produced from each acre, the higher the profit potential for the farmer. In other words, if grass or other weeds occupy space in a given acre of a rice field where a rice plant could otherwise grow and produce rice, the amount of rice harvested from that acre is less compared to if there were no grass or weeds in that given acre. Alternatively, if a rice plant is damaged and it produces less rice seed or no rice at all, the amount of rice harvested is less compared to if the rice plant was not damaged.

20. In survey after survey, rice growers say that barnyardgrass is the most troublesome weed for rice cultivation.[2] A barnyardgrass infestation of rice crop can be catastrophic, causing 21-79% yield loss, or even complete crop loss.[3]

21. For decades, Arkansas rice farmers have attempted to prevent these barnyardgrass infestations by applying herbicide to their fields. Although some treatments were moderately

---

[1] https://www.nass.usda.gov/Statistics_by_State/Arkansas/Publications/Crop_Releases/Acreage/2021/aracreage21.pdf

[2] https://www.uaex.edu/publications/pdf/FSA-2175.pdf, https://www.ricefarming.com/departments/for-most-troublesome-weed-in-rice-the-winner-is/.

[3] https://www.sciencedirect.com/science/article/pii/S2214514120301859#b0055, https://www.uaex.edu/publications/pdf/FSA-2175.pdf.

successful, Arkansas barnyardgrass developed resistance to many of the leading herbicides, including Facet, Newpath, Grasp, Regiment, Beyond, and Command. In some cases, barnyardgrass plants have been found to be resistant to multiple herbicides.

**C. Development of Loyant**

22. In January 2016, Dow AgroSciences publicly announced Loyant as the name of the company's new weed control product in rice. Dow stated that regulators would begin to register Loyant for use on rice in 2017-18.

23. Loyant is a selective, systemic, post-emergent herbicide. Post-emergent (as opposed to pre-emergent) herbicides are applied to weeds and grass that have already grown. Systemic (as opposed to contact) herbicides are absorbed into the plant, which helps destroy the entire weed structure and can prevent perennial weeds from returning. Selective (as opposed to non-selective) herbicides target certain grass and weeds without damaging any of the surrounding plants.

24. The active ingredient in Loyant is florpyrauxifen-benzyl, also known as "Rinskor active."

25. In September 2017, a year and a half after Dow first publicly announced that Loyant would be coming to market, the Environmental Protection Agency (EPA) registered the product for use on rice.

26. For the 2018 growing season, the appropriate authorities in Arkansas, Louisiana, Mississippi, Missouri, Tennessee, and Texas registered Loyant for use on rice. Since then, Loyant has also received state registrations in Florida and South Carolina.

**D. Dow's Representations about Loyant**

27. Dow's January 2016 press release trumpeting Loyant promised that it would "be an effective tool in the fight against herbicide resistance." Dow also made specific promises about

Loyant's ability to control barnyardgrass. The company said that, as part of Loyant's "robust, broad spectrum of control," the herbicide would "provide a new solution to the resistant barnyardgrass issues rice growers face." The company listed a number of weeds that Loyant was supposed to control, with barnyardgrass at the top of the list.

28. In July 2016, Dow posted on Twitter: "#Loyant(TM) controls number one weed in rice: barnyardgrass. #DowAgroSolutions".

29. Even before Dow received approval from regulatory authorities to market Loyant, Dow published a "Technical Data Sheet" promising "control of grass, sedge, and broadleaf weed species that have developed tolerance/resistance to other herbicide sites of actions." One of the "key weed species controlled in U.S. rice" was barnyardgrass:

**KEY WEED SPECIES CONTROLLED IN U.S. RICE**

| Grass Control[1] |
|---|
| Barnyardgrass |
| Junglerice |
| Broadleaf signalgrass |
| Tighthead Sprangletop* |

* Suppression

| Sedge Control[2] |
|---|
| Smallflower umbrellasedge |
| Yellow nutsedge |
| Rice flatsedge |
| Purple nutsedge |
| Rough-seed clubrush |

| Broadleaf/Aquatic Control[3] | |
|---|---|
| Velvetleaf | Spreading dayflower |
| Jointvetch | Ducksalad |
| Redstem | Falsepimpernel |
| Pigweed (includes palmer amaranth and redroot) | Monochoria |
| Ragweed | Arrowhead/bulltongue/grassy arrowhead |
| Common lambsquarters | Hemp sesbania |
| Horseweed | Cocklebur |
| Alligatorweed | Eclipta |
| Pitted morningglory | Redroot pigweed |
| Redweed | Roundleaf mudplantain |

1 Partial listing of grass weeds susceptible to Loyant herbicide when used at anticipated label use rates
2 Partial listing of sedge weeds susceptible to Loyant herbicide when used at anticipated label use rates
3 Partial listing of broadleaf weeds susceptible to Loyant herbicide when used at anticipated label use rates

30. The Data Sheet featured a photographic comparison purporting to demonstrate Loyant's ability to control barnyardgrass:



*Barnyardgrass Control*
*Untreated (Left) - Treated with 1 pint/acre pre-flood of Loyant® herbicide (Right)*

31. Dow also promised that rice exhibits "excellent crop tolerance" to Loyant.[4]

32. In September 2017, after the EPA approved Loyant for use on rice, Hunter Perry, field research and development specialist with Dow AgroSciences, said that Loyant would bring a "robust herbicide solution" to the rice community and that it would "control barnyardgrass and broadleaf signalgrass." He continued: "Loyant is very effective. It's going to bring a safe solution."

33. Dow also issued a press release touting Loyant's "[u]nmatched broadleaf, grass, sedge and aquatic weed control" and "[c]ontrol of ALS-, ACCase-, glyphosate-, propanil- and quinclorac-resistant weeds such as barnyardgrass and sedges."[5]

34. The product's specimen label—which was published that same month—stated that emerged weeds susceptible to Loyant "will be controlled." In particular, the label said that Loyant would control barnyardgrass, including species that had developed resistance to other herbicides.

---

[4] https://www.corteva.us/content/dam/dpagco/corteva/na/us/en/products/files/DF_Loyant_TechDataSheet.pdf

[5] https://mississippi.growingamerica.com/news/2017/09/new-herbicide-registration-changes-weed-management

The label listed other weeds that Loyant would either control or suppress—but barnyardgrass was, once again, at the top of the list:

**Application Rates and Weeds Controlled or Suppressed**
At a rate of 16 fl oz/acre (1 pint/acre) the following weeds are either controlled or suppressed:

| Common Name | Scientific Name | Controlled (C) or Suppressed (S) | Maximum Growth Stage |
|---|---|---|---|
| barnyardgrass[1] | *Echinochloa crus-galli* | C | 3 tiller |
| broadleaf signalgrass[1] | *Urochloa platyphylla* | C | 5 leaf |
| junglerice[1] | *Echinochloa colona* | C | 3 tiller |
| tighthead sprangletop | *Leptochloa panicoides* | S | 2 tiller |
| rice flatsedge[1] | *Cyperus iria* | C | 6 leaf |
| purple nutsedge[1,2] | *Cyperus rotundus* | C | 5 leaf |
| yellow nutsedge[1,2] | *Cyperus esculentus* | C | 5 leaf |
| Smallflower umbrellasedge[1] | *Cyperus difformis* | C | 6 leaf |
| alligatorweed | *Alternanthera philoxeroides* | C | 12" runners |
| Ammannia (red stem) | *Ammannia coccinea* | C | 8" |

35. To this day, Loyant's label continues to state that "susceptible weeds"—including barnyardgrass—"will be controlled."

36. Defendants also urged customers to mix Loyant with Clincher, a postemergence grass herbicide manufactured and marketed by Defendants.

## E. The Jones Operation's Problems with Loyant

37. The Jones Operation purchased 100 gallons of Loyant at $310 per gallon for use in the 2018 growing season. Jones made this purchase after he read and heard advertisements promising that Loyant would control barnyardgrass on rice fields. He also spoke with Dow representatives who promised him that Loyant would provide a broad spectrum of weed control, including of barnyardgrass.

38. Jones followed the instructions for use of Loyant. Using a ground rig and the exact amount of water Dow specified on the label, Jones applied Loyant to approximately 800 acres of long-grain rice containing emerged barnyardgrass.

39. Although Jones expected Loyant to begin working immediately, a week after application the barnyardgrass plants on his rice fields were not under control—it was as if the weeds had been sprayed with water, not an herbicide. After discussing the problem with a crop

consultant, who agreed that the Loyant was not working, Jones called his Dow representative. The representative informed Jones that Loyant was a "slow peel" and that, in order to maximize the herbicide's efficacy, Jones should apply fertilizer and flood his rice fields. Jones followed Dow's instructions, but these steps did not help his barnyardgrass problem. Instead, the barnyardgrass overran the rice on Jones's flooded fields. Jones salvaged what he could, but on many of the fields to which he applied Loyant, he had *zero* rice yield for 2018.

40. In 2018, the acres where Jones sprayed Loyant yielded an average of approximately 63 bushels of rice per acre. To provide a comparison and to illustrate the drastic yield decrease because of Loyant, in 2017, on the same farm, the Jones Operation yielded approximately 119 bushels of rice per acre, and in 2019 his operation yielded approximately 129 bushels of rice per acre. In addition to Loyant decreasing yields, the Jones Operation also suffered increased input costs from battling barnyardgrass and weeds that Loyant failed to control. Additionally, the quality of the Jones Operation's rice was also damaged by the Loyant itself and/or because of the barnyardgrass and weeds that overtook the fields where Loyant was sprayed ultimately causing the quality of rice produced from those acres to suffer.

41. Jones complained to Defendants after using Loyant, seeking compensation for his losses prior to filing suit. Defendants' offer in response was not sufficient.

42. If Jones had known about the problems with Loyant, he would not have purchased it or would have paid less for it.

**F. Other Growers' Problems with Loyant**

43. The Jones Operation is not alone in its issues with Loyant. Other growers and scientists have experienced problems with Loyant, including that it does not control barnyardgrass and result in injury to rice crops and diminished quality of harvested rice.

44. According to a 2019 presentation by University of Arkansas weed scientist Jason Norsworthy, Loyant had severe performance issues during the 2018 growing season. Among many other problems, Loyant had "[l]ower than expected control" of barnyardgrass populations. These control issues were "observed in the field" during the summer of 2018. Scientists also observed Loyant failure in greenhouse tests during the winter of 2019, under conditions that were "optimized for Loyant activity."[6]

45. Across 138 samples, growers experienced an average rate of 67% barnyardgrass control—far from the complete control Dow promised. Norsworthy said that most of these control issues came from "Loyant failures."

46. Norsworthy's presentation also detailed how Loyant causes crop injury. Numerous growers across the region have also reported crop injury on their Loyant-treated rice, with symptoms including "onion leafing (rolled leaves) and buggy whipping (leaves catch at the collar), twisting, and stunting."[7] Because of this, the University of Arkansas has recommended that growers "avoid" applying Loyant to hybrid, medium-grain, or long-grain Diamond rice "unless absolutely necessary."[8]

47. In addition, each year and in advance of the growing season, farmers put together their chemical and weed control programs for their upcoming crop year. This includes deciding what chemicals to use, purchasing the chemicals, and putting together the plan for when and how to apply the chemicals. The two methods that farmers use to apply chemicals to their crops are with an airplane (when possible) or a ground rig applicator. One of the advantages of using an

---

[6] https://www.uaex.edu/farm-ranch/pest-management/weed/docs/Rice%20Weed%20Control%202019%20presentation.pdf
[7] https://agfax.com/2018/06/27/texas-rice-loyant-herbicide-injury-what-we-know-right-now/
[8] https://agfaxweedsolutions.com/2019/01/14/arkansas-rice-loyant-what-have-we-learned-from-last-year/

airplane to apply chemicals has to do with timing. Specifically, if a chemical can be applied with an airplane, a farmer can avoid having to wait for fields to be dry enough to drive heavy equipment in the fields. In trying to control weeds in a rice field, when weeds emerge from the ground, they are younger and smaller. Weeds are easier to kill the younger and smaller they are. The older, taller, and more mature the weeds get, the harder they are to kill.

48. Defendants represented that Loyant could be applied using airplanes/flying services. As such, going into the 2018 crop year, farmers based their decisions for their chemical and weed control programs on Defendants' representation about being able to apply Loyant with an airplane and planned accordingly. However, in 2018, once flying services started applying Loyant with airplanes, widespread problems of Loyant drifting onto other crops began occurring. Rice farms and other crops, such as soybeans, are often grown side-by-side or in the same vicinity. Once aerial applicators started spraying Loyant in 2018, it was discovered that Loyant drifted much further than Defendants represented it would. It was also discovered that Loyant was more toxic to soybeans than Defendants represented. Due to Loyant drifting where it was not intended to be applied and killing, for example, soybeans, Loyant's drift issue quickly became "out of control" and aerial applicator companies refused to spray Loyant despite the fact many farmers built their weed control programs for 2018 using Loyant and applying it with airplanes.[9] The problem was so bad that, in May 2018, the Arkansas Department of Agriculture issued a special bulletin warning of the danger from Loyant drift.

49. Denny Stokes of Earle, a Plant Board member and owner of Stokes Flying Service, stated in 2018 that the "off-target movement of the herbicide ha[d] come from both aerial and

[9] https://agfax.com/2018/05/28/arkansas-rice-loyant-drift-preflood-n-management/

ground applications, even when applicators are closely following the label instructions for spraying the herbicide."[10]

50. Loyant's drift defect left farmers scrambling to change their weed control programs at the last minute and forced farmers to have to wait for their fields to become dry enough to apply Loyant at a later time with ground rig applicators. Since farmers had put together their weed control program to use Loyant months before the drift problem occurred, they had not planned or arranged for purchasing or using the other chemicals they could have applied with an airplane and at a time when the weeds, including barnyard grass were less mature and easier to control. Due to the last minute discovery of Loyant's drift defect, farmers were not able to change their weed control program on such short notice. Had Defendants properly tested Loyant, the drift issue would have been learned in the testing and development stage instead of in commercial rice fields and at the expense of farmers. Defendants' inadequate testing and Loyant's drift defect boxed farmers into a corner and forced them to rely upon Defendants' representations that they should let their fields dry, apply Loyant with a ground rig, and that Loyant worked so well (even if the weeds were more mature) it would kill the weeds. As the farmers waited to be able to apply Loyant with ground rigs, the barnyard grass and weeds grew. Despite Defendants' representations that Loyant would kill the more mature weeds, it did not. In addition, as time continued to pass, the weeds grew and matured beyond the point where other chemicals could be effective leaving farmers' fields overgrown and ultimately caused farmers' yields and the quality of their crops to suffer.

51. Even though Loyant's failures have been clear since 2018, Defendants continue to market Loyant for use on barnyardgrass and other key weeds.

---

[10] https://www.arkansasonline.com/news/2018/jun/01/panel-waves-off-herbicide-ban-vote-2018/

52. Based on the widespread ineffectiveness of Loyant on barnyardgrass as of the herbicide's very first growing season, either Defendants failed to adequately test Loyant before marketing it as a tool for barnyardgrass control or they were recklessly indifferent as to the possibility that the product would fail to control barnyardgrass.

53. Defendants' deficient development of Loyant was undertaken to augment their profits. On information and belief, Defendants did not permit independent scientists to exercise a sufficient degree of autonomy to determine whether Loyant would be effective on barnyardgrass in real-world conditions—despite Defendant's promise that the product would work in such a manner. In addition, Defendants marketed Loyant for use on weeds on which it was not effective in order to increase their market share relative to other herbicide manufacturers whose products were narrowly focused on certain weeds. These steps were done to minimize costs and increase market share, at the risk that rice growers would suffer economic injury when the product did not work as promised.

## V. CLASS ACTION ALLEGATIONS

54. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiffs bring their claims (as further indicated below) on behalf of themselves and a "Class," defined as:

> All persons and entities in Arkansas who purchased and used Loyant on rice crops for commercial use from 2018 through the present.

55. Excluded from the Class and Subclasses are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his or her immediate family. Plaintiffs reserve the right to revise the Class and/or Subclass definitions based upon information learned through discovery or as otherwise may be appropriate.

56. Pursuant to Rule 23(c)(4) and (5), Plaintiffs may propose and/or the Court may designate subclasses or issue classes at the time of class certification.

57. **Numerosity: Rule 23(a)(1).** The Class is so numerous that joinder of all members is impracticable. In 2018, there were 1,441,000 acres of rice planted in Arkansas by over 2,500 farms. Although the precise number of Class members can be ascertained from Defendants' records, on information and belief there are hundreds, if not thousands, of Class members in Arkansas. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

58. **Commonality: Rule 23(a)(2).** This action involves significant common questions of law and fact, including, but not limited to:

a. Whether Defendants promised that Loyant would be effective at controlling barnyardgrass;

b. Whether Loyant is effective at controlling barnyardgrass;

c. Whether Loyant provides "selective postemergence grass, sedge, and broadleaf weed control";

d. Whether Defendants made false or misleading promises that Loyant would be effective at controlling other weeds;

e. Whether Class members suffered reduced yields on rice fields where they applied Loyant, compared to yields on those same fields in years when they did not apply Loyant;

f. Whether Defendants' false and misleading representations artificially inflated the price of Loyant, causing Class members to overpay Defendants.

59. **Typicality: Rule 23(a)(3).** Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent. Plaintiffs, like all Class members, purchased Loyant for use on rice and suffered yield loss when Loyant failed to work as promised. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

60. **Adequacy: Rule 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including consumer protection and product defect litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members.

61. **Rule 23(b)(3).** Common questions of law and fact predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. Paragraph 58 above lists examples of issues that are common to all Class members and that predominate over any potential individual issues. In addition, a class action in this case would be vastly superior to thousands of individual lawsuits. Such individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Express Warranty
### (On Behalf of Plaintiffs and the Class)

62. Plaintiffs re-allege and incorporates by reference into this claim for relief all allegations set forth in paragraphs 1–61 of this Complaint.

63. Plaintiffs bring this claim for relief on behalf of themselves and the proposed Class.

64. At all relevant times, Loyant was a "good" under the Uniform Commercial Code ("UCC"). Ark. Code Ann. § 4-2-105.

65. At all relevant times, Defendants were "sellers" under the UCC with respect to Loyant. Ark. Code Ann. § 4-2-103(1)(d).

66. At all relevant times, Plaintiffs and Class members were "buyers" under the UCC with respect to Loyant. Ark. Code Ann. § 4-2-103(1)(a).

67. Defendants made numerous affirmations of fact concerning Loyant, including:

a. Representations in advertising that Loyant was effective at controlling numerous weeds harmful to rice yields, including barnyardgrass;

b. Representations through its sales representatives that Loyant was effective at controlling numerous weeds harmful to rice yields, including barnyardgrass;

c. Representations on its label and in other Dow-created and -disseminated product information that Loyant was effective at controlling numerous weeds harmful to rice yields, including barnyardgrass

68. These affirmations of fact formed the basis of the bargain between Defendants and Plaintiffs and Class members.

69. Loyant did not conform to Defendants' affirmations of fact.

70. Defendants intended that Plaintiffs and Class members would rely on these representations. Indeed, Plaintiffs and Class members did rely on these representations—including Defendants' written representations on the product label—when purchasing Loyant.

71. Plaintiffs and Class members—rice farmers and/or growers—are persons and entities whom Defendants might have reasonably expected to use Loyant.

72. Plaintiffs notified Defendants of the breach of warranty within a reasonable time. Specifically, Stan Jones contacted his Dow representative to inform the company that Loyant was ineffective at controlling barnyardgrass and to request a remedy for this ineffective product.

73. As a direct result of Defendants' breach of warranty, Defendants injured Plaintiffs and the Class members and proximately caused them damages.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class seek:

a. An order certifying the Class under Federal Rule of Civil Procedure 23(a) and (b)(3), appointing Plaintiffs and their Counsel to represent the Class, and for notice to the Class to be paid by Defendants;

b. Damages suffered by Plaintiffs and the Class members, including consequential damages;

c. Punitive damages;

d. Plaintiffs' reasonable attorneys' fees';

e. Plaintiffs' and Plaintiffs' counsel's recoverable fees, costs, and expenses;

f. Pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

g. Such other and further relief deemed just and proper under equity or law.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Dated: November 15, 2021

Respectfully submitted,

**Joseph Henry (Hank) Bates, III**
Bar Number 98063
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
Fax: (501) 312-8505
Email: hbates@cbplaw.com

Jonathan D. Selbin (*pro hac vice* forthcoming)
Jason L. Lichtman (*pro hac vice* forthcoming)
Daniel E. Seltz (*pro hac vice* forthcoming)
Gabriel A. Panek (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Fax: (212) 355-9592
Email: jselbin@lchb.com
Email: jlichtman@lchb.com
Email: dseltz@lchb.com
Email: gpanek@lchb.com

***Attorneys for Plaintiffs and the Proposed Class***